UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

DANIEL LAMARCO,

                                                  Plaintiff,      **COMPLAINT AND**
                                                                        **JURY DEMAND**
               -against-

THE UNITED STATES OF AMERICA, DOCTOR
ANTHONY BUSSANICH, DOCTOR ROBERT
BEAUDOUIN, PHYSICIAN ASSISTANT YOON KANG,
MEDICAL ADMINISTRATOR YONNONE AND JOHN
DOE ##1-5,

                                                            Defendants.

------------------------------------------------------------------------ x

       Plaintiff DANIEL LAMARCO, by his attorney, Stoll, Glickman & Bellina, LLP, for his complaint alleges as follows:

**PRELIMINARY STATEMENT**

1. This is a civil rights action in which Plaintiff seeks relief for violation of his rights secured by the Federal Tort Claims Act, as well as the Eighth and Fourteenth Amendments to the United States Constitution.

2. The claim arises from a series of incidents which began in June 2017, in which personnel employed by the United States Bureau of Prisons ("BOP"), acting under color of law, intentionally and negligently failed to provide safe housing and adequate medical care and treatment to Plaintiff while Plaintiff was a prisoner at the Metropolitan Correctional Center ("MCC"), in the custody of the BOP. As a result of Defendants' negligence and subsequent willful denial of medical treatment, Plaintiff suffered serious permanent injuries.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as

the Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny, and the Eighth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Southern District of New York in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## PARTIES

6. Plaintiff Daniel Lamarco was, at all relevant times, a prisoner at the Metropolitan Correctional Center ("MCC") in New York County, City and State of New York, in the custody and control of Defendants and subject to the care and treatment of the Defendants for housing and medical evaluation and treatment.

7. Physician Assistant ("P.A.") Kang, is a medical care provider employed by the BOP on or about the dates of the incident. P.A. Kang performed the medical intake and subsequent history and physical of Plaintiff upon his entry into BOP custody. With respect to the Bivens claims, she is sued in her individual capacity.

8. Dr. Anthony Bussanich and Dr. Robert Beaudouin were medical personnel employed by BOP at all relevant times herein. Both were responsible for the issuance of bottom bunk passes and the direct administration of medical treatment to Plaintiff as well as the general oversight of medical services provided to the inmates confined at MCC. At all times here relevant, defendants Bussanich and Beaudouin were, or represented to the public in general, and

to Plaintiff Lamarco in particular, to be able, competent and capable to skillfully diagnose, care for and treat patients in general, and Plaintiff in particular, in accordance with good and accepted standards of medical care and practice. With respect to the Bivens claim, both defendants are sued in their individual capacity.

9. Health Services Administrator Yonnone was employed by the BOP at all times here relevant. Mr. Yonnone was in charge of the custody and care provided to Plaintiff. He was responsible for ensuring that inmates with medical needs are scheduled for, and taken to, medical visits with external providers. With respect to the Bivens claim, he is sued in his individual capacity.

10. John Doe #1-5 were personnel employed by BOP at all relevant times herein and were involved in assignment of housing, maintaining safe conditions in the dorm areas, inmate work assignments and providing medical care to the inmates of MCC. John Doe #1-5 are sued in their individual capacities in connection to Plaintiff's Bivens claim.

11. The United States of America is subject to suit for personal injury caused by the negligent and wrongful acts and omissions of employees of the Government while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the Plaintiff, pursuant to the FTCA.

12. At all times material to this action, Defendants were responsible for the correct and prompt response to the health care needs of inmates in its custody.

13. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York, and of the United States of America.

## DISPOSITION BY FEDERAL AGENCY

14. Pursuant to the FTCA, on or about December 4, 2018, Plaintiff caused a Standard Form 95 to be served on the United States Bureau of Prisons, raising the issues alleged here. By letter dated June 5, 2019, the Federal Bureau of Prisons, Northeast Regional Office, determined that the claim was denied.

15. This action is timely pursuant to 28 U.S.C. § 2401(b) in that this action was begun within six months of receipt of the letter sent by the federal agency denying the claim.

## FACTUAL ALLEGATIONS

16. On May 4, 2017, Plaintiff voluntarily surrendered to MCC as a sentenced prisoner. As part of the intake procedure, Plaintiff was medically screened by defendant Kang. Plaintiff told defendant Kang that he had a weak right knee from surgery for a torn meniscus and would need to be placed on a bottom bunk. Defendant Beaudouin cosigned this Health Screen of Plaintiff.

17. Despite his medical condition, Plaintiff was housed inside a dorm style setting and assigned to a top bunk bed.

18. The top bunk to which Plaintiff was assigned was wedged between two walls and did not have a ladder or other method to access the bed. Plaintiff was forced to climb on a chair or use other means to enter and exit his bed every day.

19. On May 12 and May 16, Plaintiff was seen by medical staff, including defendant Kang, and he informed them again about his compromised knee and surgery history for a torn meniscus. Defendant Beaudouin reviewed and cosigned this History and Physical.

20. At this health screen, Plaintiff again requested that he be housed on a low bunk. His request was ignored.

21. On June 2, Plaintiff's knee buckled while he was exiting his bed causing him to fall and

4

slam his head, shoulder and back onto the bottom bunk and the floor. Other inmates rushed to his side and placed him in a chair. The room began spinning and Plaintiff lost consciousness.

22. Eventually Plaintiff was escorted to the medical area of the jail where he was seen by defendant Bussanich. Plaintiff complained repeatedly that he could not move his arm and was in pain. Bussanich assured him he would order an x-ray and that he would be fine. He was given a sling and sent back to the dorm without pain medication.

23. That same evening, Plaintiff attempted to obtain pain medication but was yelled at by defendant Kang who claimed he didn't need medication.

24. On June 7, after days of extreme pain and no medication, Plaintiff was taken for an x-ray which revealed a separated shoulder and a widening of the AC joint. A visual inspection of Plaintiff's shoulder area also showed an obvious displaced muscle protruding from his body. Plaintiff requested an MRI that would be able to better diagnose the problem.

25. On June 21, Plaintiff was examined at Brooklyn Hospital and told not to return to normal activity with the damaged arm for at least another six weeks and that he would need a neurological exam for further diagnosis and treatment. The BOP Clinical Encounter document, cosigned by defendant Beaudouin, notes that Plaintiff appears distressed and appears in pain. Plaintiff was finally prescribed ibuprofen for the ongoing pain.

26. On approximately July 6, Plaintiff was awakened by a BOP Correction Officer. He explained that Plaintiff had been cleared for work, was assigned to the sanitation crew and would begin work immediately. Plaintiff explained that his arm was still not working properly and that the medical staff of Brooklyn Hospital said he needed at least six weeks of rest. The Correction Officer gave him a choice; come to work or go to solitary confinement. BOP had ordered Plaintiff to work a manual labor job despite the documented medical order to rest the arm and

5

shoulder. Plaintiff began working the night shift despite the weakness and extreme pain in his arm and shoulder.

27. Over the next several months, Plaintiff repeatedly filed complaints with the jail explaining that he is in extreme pain, has frequent bouts of dizziness, needs the neurological exam ordered by Brooklyn Hospital and other medical treatment.

28. On August 8, Plaintiff happened to see defendant Bussanich in the jail. Plaintiff showed Bussanich the clearly displaced muscles in his chest and shoulder area and requested an MRI. Bussanich explained that Plaintiff will not receive an MRI until he completes physical therapy. Plaintiff asked to begin physical therapy. Bussanich explained that there is no physical therapist on staff.

29. Finally in November 2017, Plaintiff was scheduled for physical therapy. Although he attended some sessions, defendants repeatedly scheduled the appointments for a time when Plaintiff was unable to attend because of his mandatory work schedule. It took several months, specifically until February 2018, for the defendants to re-schedule the therapy sessions at a time when Plaintiff could regularly attend.

30. After physical therapy was completed and ineffective, Plaintiff requested an MRI again. A Physician's Assistant confirmed that the "left pectoral muscle appears deformed…" and put in a request to the BOP Grand Prairie Administrative office for approval. On April 6, 2018, the request for an MRI is approved.

31. In April, May, June and July, Plaintiff repeatedly filed requests with the defendants, including defendant Yonnone, to schedule the MRI that had been approved. In June 2018, defendant Yonnone asked Plaintiff to withdraw his latest complaint in exchange for a promise that the MRI would take place in June. Plaintiff agreed to withdraw but the MRI was not

scheduled in June.

32. On July 18, 2018, more than one year after the injury, Plaintiff was finally taken to the hospital for an MRI. He is told he will have the results in three days and would need a follow up appointment with an orthopedist to review the results. The results were not provided to Plaintiff until approximately six weeks later. The MRI revealed a persistent widening of the shoulder joint and a torn ligament. After receiving the results, the medical department approved Plaintiff for an orthopedist appointment.

33. On November 9, 2018, Plaintiff was again taken to Brooklyn Hospital to supposedly consult with an orthopedist. The staff at Brooklyn Hospital were shocked that more than three months had passed since the MRI and more than 16 months since the injury. However, there was no orthopedic doctor available that day because there are never doctors available on Wednesdays. Plaintiff never received an explanation from defendant Yonnone as to why he would be scheduled for a consult on a day there was no doctor available.

34. In December 2018, Plaintiff's medical condition was finally assessed by defendants along with the Brooklyn Hospital MRI results. Plaintiff was diagnosed with a chronic and traumatic rupture of the bicep, a chronic rupture of the left pectoral muscle and an obvious cosmetic deformity.

35. Because the defendants acted with deliberate indifference by forcing plaintiff to work a physically demanding job soon after the injury, by denying Plaintiff appropriate and prompt medical attention, such as physical therapy and an MRI that would have identified the issue and allowed for appropriate corrective treatment, and committed medical malpractice, Plaintiff endured pain for more than a year and has permanent damage to his arm and shoulder. Plaintiff will have chronic pain for the rest of his life and a reduction in strength in the arm and shoulder.

36. During all of the events above described, Defendants acted negligently and with deliberate indifference toward Plaintiff.

37. As a direct and proximate result of the acts of Defendants, Plaintiff suffered the following injuries and damages:

   a. Violation of his rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment;
   b. Emotional trauma;
   c. Permanent damage to his shoulder and chest; and
   d. Physical pain and suffering.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983

38. The preceding paragraphs are here incorporated by reference.

39. Defendants Bussanich, Beaudouin, Kang, Yonnone and John Does #1-5 have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and are liable to Plaintiff pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny.

40. Defendants' conduct deprived Plaintiff of his right to be free from cruel and unusual punishment by purposefully denying Plaintiff essential medical care and by their deliberate indifference to his serious medical condition, despite knowledge of the visible deformity caused by the injury and Plaintiff's repeated complaints about the pain in his shoulder area, in violation of the Eighth Amendment to the United States Constitution.

41. Defendants were deliberately indifferent to Mr. Lamarco's serious medical needs in that they failed to take reasonable measures to provide him with proper medical treatment, or

access to proper medical attention, for more than a year even though they knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages.

42. Despite their knowledge that he was facing a substantial risk of debilitating permanent injury, defendants had Mr. Lamarco wait an excessively long period of time before receiving proper medical examination, physical therapy and treatment. As detailed above, Mr. Lamarco waited eight months after the injury for physical therapy and eighteen months after his injury to have a doctor diagnose his condition with the aid of an MRI.

43. Over those eighteen months, the defendants and other jail staff expressed shock when shown the displaced muscle protruding from Plaintiff's upper body. In addition, Mr. Lamarco repeatedly informed defendants of the urgency of his medical conditions, his constant pain and his need to receive medical tests and attend follow up appointments. Defendants failed to take the steps to schedule, arrange or allow necessary medical visits to occur.

44. The actions of defendants were so substandard and egregious that they were outside the course and scope of their employment. Their actions and judgments in failing to examine, diagnose, or treat Plaintiff were so far below the acceptable standard that Defendants could not have been making a medical judgment in their decision to deny Plaintiff even the most basic medical evaluation or treatment. Defendants actions were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a) because their decision to deny Plaintiff medical care was not based on a medical reason, but rather economic and/or other constitutionally impermissible reasons unrelated to the provision of medical services, and demonstrated a purposeful denial of essential medical care for a serious medical condition, and were deliberately indifferent to his serious medical condition.

45. Defendants violated clearly established law by failing to adequately treat a serious

medical condition.

46. Plaintiff has been damaged as a result of Defendants' wrongful acts. Those damages include, but are not limited to, prolonged pain and discomfort, permanent damage to his shoulder and chest area, a lifelong decrease is strength, atrophy to the muscle area limiting his range of movement, loss of quality of life, extreme frustration, and future medical expenses.

## SECOND CAUSE OF ACTION
FEDERAL TORT CLAIMS ACT

47. The preceding paragraphs are here incorporated by reference.

48. The United States of America is liable for the acts and omissions of Defendants, pursuant to 28 U.S.C. § 2674, for actions they undertook while acting within the scope of their office or employment.

49. Defendant United States of America has in its employ and/or agency correctional staff, including medical care providers and administrators, over which it exercises control and supervision. At all times material to this action, Defendant authorized these agents and employees to act for Defendant when they committed the negligent acts alleged above, and had control over the agents when they committed the negligent acts.

50. Defendant had a non-delegable duty to provide Plaintiff with safe housing while he was incarcerated in MCC. Defendants breached that duty by requiring Plaintiff, who they were aware had physical limitations, to sleep in a top bunk **and** by failing to provide a means to safely access the top bunk.

51. None of the bunks in Plaintiff's dorm area had ladders which, upon information and belief, caused many inmates to fall trying to access their beds. The bunk to which Plaintiff was assigned was even more precarious given it was squeezed in between two walls and therefore climbing up from the head or foot of the bed was impossible. Furthermore, upon information

10

and belief, BOP defendants actually possessed ladders for the beds but had failed to install them.

52. Defendant had a non-delegable duty to provide Plaintiff with adequate medical care. At all times here relevant, Defendant, by and through its staff, physicians, employees and/or agents, acting within the course and scope of their employment and/or agency, undertook a duty to render medical care to Plaintiff, in a skillful and careful manner and in accordance with the accepted standards of medical care and treatment rendered in such cases by physicians in New York, or in any similar medical community.

53. At all times here relevant, Defendant, by and through its staff, physicians, employees, and/or agent, acting within the course and scope of their employment and/or agency, negligently breached the duty of care owed to Plaintiff by failing to examine, diagnose, care for, and treat Plaintiff in accordance with the accepted standards of care. Defendants Bussanich and Beaudouin did not have the necessary skills to treat and diagnose Plaintiff and failed to apply the skills they did possess.

54. The care and treatment of Plaintiff by the defendants fell below the prevailing standard of professional care for a primary care physician in one or more of the following ways:

   a. Failure to fully and properly document the symptoms experienced by Plaintiff in the time period leading to his eventual diagnosis;

   b. Failure to properly consider and/or diagnose Plaintiff's excruciating and severe pain in his arm and shoulder following the June 2017 injury, despite repeated requests for treatment, care, and evaluation;

   c. Failure to perform necessary medical testing within a reasonable period of time when Plaintiff was experiencing pain so the cause of Plaintiff's pain could be determined and effectively treated;

    d. Failure to provide consistent physical therapy within a reasonable period of time after the injury; and

    e. Failure to make an immediate referral to a specialist, both after the injury and after the pain did not subside and physical therapy was ineffective, to determine the cause of Plaintiff's severe and excruciating pain in his shoulder and chest area.

55. As the direct and proximate cause of Defendants' failure to properly diagnose and treat Plaintiff's severe and excruciating pain Plaintiff suffered permanent damage to his shoulder, chest and arm.

56. It is more likely than not that if Plaintiff had been treated in a timely fashion after his initial injury, complaints of pain and visible deformity, Plaintiff would not have suffered permanent damage to his chest, arm and shoulder.

57. As the direct and proximate result of the negligence, carelessness, and medical malpractice of Defendant's employees and contractors, Plaintiff has suffered pain, mental anguish, bodily injury, and permanent disability, and will continue to suffer pain, mental anguish, bodily injury, and permanent disability in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

    A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

    B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

    C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

    D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:    Brooklyn, New York
November 22, 2019

Yours, etc.,

*/s/ Nicole Bellina*

STOLL, GLICKMAN & BELLINA, LLP
By: Nicole Bellina, Esq.
Attorney for Plaintiff
300 Cadman Plaza West Fl.12
Brooklyn, NY 11201
(718) 852-3710
nbellina@stollglickman.com

TO:    The United States Attorney's Office
Southern District of New York
86 Chambers Street / 3rd Floor
New York City, NY 10007

Anthony Bussanich, MD
Robert Beaudouin, MD
Yoon Kang, P.A.
Administrator Yonnone
150 Park Row
New York, NY 10007

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

DANIEL LAMARCO,

                                  Plaintiff,     **CERTIFICATE OF MERIT**

        -against-

THE UNITED STATES OF AMERICA, DOCTOR
ANTHONY BUSSANICH, DOCTOR ROBERT
BEAUDOUIN, PHYSICIAN ASSISTANT YOON KANG,
MEDICAL ADMINISTRATOR YONNONE AND JOHN
DOE ##1-5,
,
                                  Defendants.

------------------------------------------------------------------------ x

      I, Nicole Bellina, of Stoll, Glickman & Bellina, LLP, Plaintiff's attorney in this action, have consulted with at least one doctor who is knowledgeable on the relevant issue and I have concluded that there is a reasonable basis for the commencement of this action.

      Pursuant to CPLR 3012-a, I affirm this Certificate of Merit under penalties of perjury.

Dated: Brooklyn, NY
       November 21, 2019

Nicole Bellina
Stoll, Glickman & Bellina, LLP
300 Cadman Plaza West Fl.12
Brooklyn NY 11201
(718) 852-3710

_____
By: NICOLE BELLINA